# NO. 12-20-00274-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE* |
| *A.M., H.M. AND A.M.,* | § | *COUNTY COURT AT LAW* |
| *CHILDREN* | § | *ANDERSON COUNTY, TEXAS* |

## MEMORANDUM OPINION

M.T. appeals the termination of her parental rights. In one issue, she argues that the evidence is legally insufficient to support the trial court's finding that termination was in the best interest of the children. We affirm.

## BACKGROUND

M.T. is the mother of A.M.,[1] H.M.,[2] and A.M.2.[3] On April 22, 2019, the Department of Family and Protective Services (the Department) filed an original petition for protection of A.M., H.M., and A.M.2, for conservatorship, and for termination of M.T.'s parental rights. The Department was appointed temporary managing conservator of the children, and M.T. was granted limited access to, and possession of, the children.

At the conclusion of a bench trial, the trial court found that M.T. engaged in one or more

---

[1] The eldest and youngest children have the same initials. We will refer to the youngest child as A.M.2.

[2] The trial court found by clear and convincing evidence that J.M., the father of A.M. and H.M., executed an unrevoked or irrevocable affidavit of relinquishment of parental rights to the children. The trial court also found that termination of the parent-child relationship between J.M., A.M., and H.M. was in the children's best interest. Accordingly, the trial court ordered that the parent-child relationship between J.M., A.M., and H.M. be terminated. J.M. is not a party to this appeal.

[3] The trial court found that A.B.T. is the father of A.M.2. and found by clear and convincing evidence that A.B.T. executed an unrevoked or irrevocable affidavit of relinquishment of parental rights to the child. The trial court also found that termination of the parent-child relationship between A.B.T. and A.M.2. was in the child's best interest. Accordingly, the trial court ordered that the parent-child relationship between A.B.T. and A.M.2 be terminated. A.B.T. is not a party to this appeal.

of the acts or omissions necessary to support termination of her parental rights under subsections (D), (E), and (O) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between M.T., A.M., H.M., and A.M.2. is in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between M.T., A.M., H.M., and A.M.2 be terminated. The trial court filed findings of fact and conclusions of law. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2020); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2020); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2020); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2019). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

2

## STANDARD OF REVIEW

In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## BEST INTEREST OF THE CHILD

In her sole issue, M.T. argues the evidence is legally insufficient to support a finding that termination of her parental rights is in the children's best interest. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we will consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West 2019). These include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal

changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.–Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d 494, 507 9Tex. App.—Fort Worth 2009, no pet.). But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d 17, 28-29 (Tex. 2002). We apply the statutory and *Holley* factors below.

## Analysis

This case began with a 911 call that was disconnected. Law enforcement proceeded to M.T.'s home and contacted the Department, informing them that the children's environment was unsanitary and unsafe. After a Department investigation, a safety plan was put into place wherein the mother and children moved in with a relative, M.T.'s grandmother, and the case was transferred to family based safety services (FBSS). According to Theresa Pielmeier, the children's conservatorship worker, A.M. and H.M. told investigators that they physically fought with each other and their grandmother. The condition of the grandmother's house was not sanitary, including animal feces on the floor and a general lack of hygiene. The sole heater for the house was open and exposed to the children including A.M.2, who was two years old. According to Pielmeier, M.T. admitted that the grandmother's home was not suitable for the children as it was neither clean nor sanitary.

At the first meeting between FBSS workers and M.T., she signed an acknowledgment of substance abuse, stating that she recently used methamphetamine. At that time, drug tests were performed on all parties, including the children. On April 18, 2019, M.T. and H.M. tested positive for methamphetamine, and A.M.2 tested positive for marijuana. The children were

4

removed due to concerns of continued substance abuse by M.T. and placed with fictive kin, T.M.

Previous Department History. Pielmeier stated that there were eight investigations involving the family, five of which occurred within thirteen months of the date of trial. In 2014 and 2015, the Department determined that there was "reason to believe" neglectful supervision due to substance abuse and M.T.'s paramour. Allegations of neglectful supervision were "ruled out" for cases beginning on April 28, 2014, January 5, 2018, and July 11, 2018. However, on October 26, 2018, allegations involving the grandmother shoving food into the mouth of one of the children was determined to be "reason to believe." On November 28, 2018, the Department determined that allegations involving M.T.'s paramour punching one of the children was "reason to believe." According to Pielmeier, M.T. introduced her paramour into the children's lives and allowed them to be placed in situations where he was able to harm them. M.T. agreed, stating that she made a choice "over and over again" exposing her children to "horrible" situations. At the time of trial, M.T.'s paramour was incarcerated after his community supervision was revoked and he was adjudged guilty of abandonment and endangerment of a child, H.M. He was sentenced to two years in a state jail facility.

Criminal History. In July 2016, M.T. pleaded guilty to assault causing bodily injury of a family member, her paramour, a Class A misdemeanor. The trial court deferred an adjudication of guilt and placed her on community supervision for twelve months. She was discharged from community supervision approximately two years later. Also, in July 2016, M.T. pleaded guilty to abandonment and endangerment of a child, H.M., a state jail felony. The trial court deferred an adjudication of guilt and placed her on community supervision for four years. At trial, she admitted that she was in the Anderson County jail, that there was a motion to revoke her community supervision after the trial, and that she faces the possibility of two years in a state jail facility.

Substance Abuse. As part of M.T.'s service plan, she was required to submit to drug testing upon request. Pielmeier stated that, at times, M.T. submitted to drug testing, but sometimes she refused. We note that M.T. tested positive for methamphetamine on April 18, 2019. During the case, the record shows that she tested positive for amphetamine and/or methamphetamine seven times, had seven "no shows" after the Department requested that she drug test, had one negative "dilute" test, and approximately six negative drug tests. She also refused a hair follicle test at least three times. M.T. also had one urine sample that was deemed

"too cold" for testing, but she did not give the testing site another urine sample that day or the next day.

The Department contends that M.T. has an active substance abuse problem, has not taken any of the steps necessary to overcome her problem, and has not ameliorated any of the conditions relating to her drug use that brought her children into the care of the Department. To Pielmeier's knowledge, M.T. has not participated in Narcotics Anonymous or Alcoholics Anonymous. According to records from Stephanie Teel, a substance abuse counselor, M.T. was unsuccessfully discharged for nonattendance, denied any drug use in spite of positive tests, denied the severity of her addiction, and refused to attend an impatient drug rehabilitation treatment program.

M.T. admitted at trial that she "has had" issues with drugs but has not used methamphetamine for a month. Her drugs of choice were crack, powder cocaine, and methamphetamine. According to M.T., she "begged and cried out" for help and to attend drug rehabilitation.

Mental Health. Dan Boynton, Ph.D., a licensed psychologist, diagnosed M.T. with bipolar 1 disorder, current or most recent episode depressed, in partial remission; generalized anxiety; and substance abuse disorder. According to his evaluation, M.T.'s child abuse potential inventory validity scores indicated some inconsistency and "faking good," but an elevated abuse score. She denied using any illegal or street drugs on the date of the evaluation, July 23, 2019, but admitted using methamphetamine, crack, and powder cocaine one month before the evaluation. M.T. stated that she had been prescribed Trintelliz, Latuda, and Trazondone, and had been hospitalized for a mental disorder in 2013 and 2017. Boynton recommended counseling for M.T.'s bipolar disorder, anxiety, and child abuse, and a referral to a substance abuse counselor. According to Pielmeier, Boynton's report also stated that M.T. self-reported attempted suicide, made suicidal threats, alluded to past child abuse, committed acts of self-harm, and regularly engaged in unlawful behavior in the past.

Children's Environment, Past and Present. At the time of trial, A.M. was eleven years old, H.M. was nine years old, and A.M.2 was three years old. Their first foster mother, T.M., was fictive kin and took all the children when they were removed from M.T. According to T.M., A.M. and H.M. were, initially, compliant, but their behavior soon deteriorated. A.M. cursed at her, tore up the house, threw things at the glass windows, and flooded the backyard. A.M.

threatened to commit suicide, stating that she could cut her throat. She also threatened to hang herself with a cable in a tree while trying to pull A.M.2 up the tree. T.M. physically removed A.M.2 from the backyard while A.M. screamed that he was her brother, and she could "do whatever" with him. H.M. physically hit A.M.2, who was two years old, and was physically aggressive towards A.M. and T.M.

At the time of trial, all three children were in separate foster homes, partially because of the constant, violent fighting between A.M. and H.M. T.M. described the relationship between A.M. and H.M. as "very violent" and stated that A.M. was "very abusive" towards H.M. She testified that at times A.M. would walk up to H.M. and slap or drop kick him. A.M. hurt H.M. so badly that T.M. had to take H.M. to the hospital. According to T.M., H.M. was responsive to correction, but A.M. was not, stating that if you asked her to stop jumping on the bed, she would jump on the bed until it broke. M.T. explained that A.M.'s and H.M.'s behavior resulted from what they had seen at home, agreeing that there was family violence between she and her paramour, she and other family members, and her grandparents and the children. She knew that the children fought, that it was the result of their environment, and that she was responsible for that environment.

When A.M.2 was placed with T.M., he hit her in the face, screamed, threw himself down, ripped the sheets from his bed, harmed himself, and threw his mattress off the bed. At the time of trial, he was compliant, picked up his toys when told, and could both count and recite his ABC's. According to Pielmeier, A.M.2 had physical problems that required the utilization of leg braces and extra therapy in order to walk, specifically, to support and align his ankles. The records at Prosthetic-Orthotic Associates of East Texas show that on August 22, 2018, A.M.2 was cast for braces and they were fitted at a later appointment. At that appointment, M.T. was shown how to install and clean the braces and received wearing instructions. She and A.M.2 were supposed to attend a follow-up appointment a month later, but she did not show up for the appointment or return to the office while the child was in her care.

According to Pielmeier, M.T. did not provide A.M.2's braces to the Department when he came into the Department's care and the condition of his feet, ankles, and legs had not improved. His foster mother, T.M., stated that when she received A.M.2 in April 2019, he could stand for only brief moments and take only three or four steps before sitting. Beginning in May 2019, T.M. had new braces cast for A.M.2 and testified that he wears his braces daily. T.M. stated that

he has learned, with assistance, how to put them on and take them off, runs and jumps like a normal three year old child. Pielmeier testified that A.M.2, has made a "huge" improvement, and is a "different child." According to Pielmeier, M.T. did not provide A.M.2 with the necessary orthotics and therapy critical to his ability to walk.

Children's Mental Health Diagnoses. Carmella Jones, LLC, a licensed professional counselor diagnosed A.M. with adjustment disorder with anxiety; sibling relational problems; attention deficit hyperactive disorder; post traumatic stress disorder; child sexual abuse; oppositional defiant disorder; child neglect; and unspecified personality disorder (manipulative, deceitful). In her evaluation, she stated that A.M. was a poor candidate for therapy, and recommended that contact with M.T. should be reduced. Jones also stated that A.M. told her that M.T.'s paramour sexually assaulted her and hit H.M.

Jones diagnosed H.M. with adjustment disorder with disturbance of emotions and conduct; sibling relational problems; trauma stressor related disorder; oppositional defiant disorder; parent-child relational problems; and child neglect. In her report, Jones stated that H.M.'s anger was easily triggered and that he tended to overreact over trivial matters. According to Jones's evaluation, H.M. was admitted to a behavioral health center in August 2019 and released with diagnoses of sleep disturbance, aggression, depression, and psychosis. H.M. reported that M.T.'s paramour hit him with a BB gun and sexually assaulted A.M.

Service Plan. According to the Department, M.T. failed to follow the service plan ordered by the trial court in order to regain possession of her children. M.T. initially complied with some of the tasks in her service plan, having completed two ETCADA assessments, a psychological evaluation, and parenting classes, and having been successfully discharged from individual counseling and substance abuse counseling. However, Pielmeier stated, M.T. began abusing drugs again in the latter part of 2019 and her attempts at completing her service plan suffered.

According to Pielmeier, M.T. did not provide any support for the children throughout the case. Once, M.T. brought a bag of clothes for the children, but the Department had to throw it away because it smelled of methamphetamine. M.T. lacked steady employment. She provided Pielmeier with three jobs during the case: Northside Nutrition, Sanderson Farms, and Little Caesars. However, she was fired from Northside Nutrition in October 2019, never provided Pielmeier a pay stub from Sanderson Farms in February 2020, and worked at Little Caesars for

about two weeks in July 2020.

Pielmeier stated that M.T. did not consistently visit her children. Before March 2020, M.T. was offered weekly visitation with all three children and was "pretty steady" with those visits. When A.M. and H.M. were moved to different foster homes, she agreed to a four hour visit with A.M. and weekly telephone contact. Although she took advantage of the telephone visitations, Pielmeier stated that M.T. only participated in one visitation with A.M. in four months. She never visited H.M. at his treatment facility and would frequently not answer the telephone.

In early 2020, all visitations became virtual and M.T.'s participation worsened. The problem appeared to be M.T.'s failing to answer the telephone and changing her telephone number frequently without informing the Department, the foster families, or the treatment facility. Further, telephone calls between A.M. and M.T. went well as long as the therapist was involved. Otherwise, the therapist was concerned that the visitations were neither beneficial nor positive for A.M. According to M.T., she testified that she did not change her telephone number and that her missed visitations were due to a conflict with her work schedule.

Plans for the Children. As noted above, all three children were placed in separate foster homes and, if M.T.'s parental rights were terminated, the Department stated that the children would be adopted by three separate families. Although an attempt had been made to place the children together, the oldest two children were very angry with one another and physically fought. The guardian ad litem and CASA volunteer agreed, stating that A.M. and H.M. are not compatible and they did not believe it was in the children's best interest to be in the same home.

Pielmeier stated that A.M. is placed with a therapeutic foster family trained to meet her special needs, such as anger, aggression, stealing, and lying. A.M.'s foster mother stated that she is doing "fairly well," and described A.M. as very smart, "street" smart, manipulative, and athletic. A.M. has moments of cursing and anger and needs to "chill out" before working on any problem. With the right counseling and the right family, the foster mother believed that A.M. could become ready for an adoptive placement and become a "very good" adult. According to Pielmeier, there is a family interested in adopting A.M.

At the time of trial, H.M. was in a children's home after leaving a behavioral health clinic. The case manager at the children's home stated that H.M. was doing "great," was a bright child, and was doing well in school. The children's home was working with him on developing

9

coping skills, providing recreational and educational services, and preparing him for a potential adoptive home. The case manager believed H.M. was an "excellent" candidate for adoption. According to Pielmeier, H.M. is in Boy Scouts and one of the families in Boy Scouts, a foster family, expressed an interest in adopting him. Regarding A.M.2, Pielmeier stated that he is placed with T.M., fictive kin, and is in a stable, violent-free adoptive home. He is very happy and loved. A.M.2 has special needs and his current placement is able to meet those needs, ensuring that he wears his braces and receives therapy.

M.T. also has plans for the children. Upon release from the Anderson County jail, she wanted to move in with her father in Corsicana where she would have stability and family support. She stated that she could be employed with a temporary agency within a week, and her father could care for her children while she worked. She believed it was in the children's best interest to be with her in Corsicana and not to be separated. However, according to the Department and M.T., her father is disabled. Pielmeier stated that M.T.'s father was contacted as a possible placement for the children, but he was not willing to take all of them. He only wanted A.M. because she could help him cook and clean. According to M.T., she would obtain overnight employment and "hope" that A.M.2 would sleep all night and not need her father to care for him. The Department did not believe that M.T.'s father was an appropriate placement for the children.

Determinations and Findings. The guardian ad litem and CASA volunteer believed it was in the children's best interest for M.T.'s parental rights to be terminated and for the children to be adopted. According to the guardian ad litem and CASA volunteer, M.T. endangered all of the children and failed to comply with her service plan. Pielmeier testified that M.T. placed the children in situations or created situations that could cause them physical, emotional, or developmental harm; created a risk of danger to her children because two of them tested positive for illegal substances; had an unsafe home; and threatened the children's health, safety, and stability as the result of her substance abuse because of the risk of M.T. being incarcerated.

In its findings of fact and conclusions of law, the trial court noted that the "central problem" was M.T.'s fifteen-year history with substance abuse for almost half her life. Further, it determined that in spite of the consequences for her and the children, M.T. was unable to avail herself of the "help, support, and services" offered to her by the Department.

**Conclusion**

10

After viewing the evidence in the light most favorable to the trial court's best interest finding and applying the statutory and *Holley* factors, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of M.T.'s parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Although some evidence might weigh against the finding, such as M.T.'s plans for the children after being released from jail, this evidence is not so significant that a reasonable fact finder could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating M.T.'s parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we overrule M.T.'s sole issue regarding best interest.

## DISPOSITION

Having overruled M.T.'s sole issue, we *affirm* the judgment of the trial court.

<u>GREG NEELEY</u>
Justice

Opinion delivered April 21, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**APRIL 21, 2021**

**NO. 12-20-00274-CV**

**IN THE INTEREST OF A.M., H.M. AND A.M., CHILDREN**

Appeal from the County Court at Law
of Anderson County, Texas (Tr.Ct.No. CCL-19-16417)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*